## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
RMH FRANCHISE HOLDINGS, INC., et al.,         :    Case No. 18-11092 (BLS)
                                              :
                       Debtors.¹             :    (Joint Administration Pending)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DECLARATION OF MITCHELL S. BLOCHER
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

1.      I am the Chief Financial Officer of each of the debtors in the above-captioned cases (collectively, the "Debtors").  As a result of this work, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' chapter 11 efforts.

2.      I submit this declaration (the "Declaration") in support of the First Day Pleadings (defined below) and other subsequent pleadings, as well as to provide information to parties-in-interest regarding the Debtors.  Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; and (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: RMH Franchise Holdings, Inc. (7150); RMH Franchise Corporation (1807); NuLnk, Inc. (7381); RMH Illinois, LLC (0696); Contex Restaurants, Inc. (0710).  The Debtors' principal offices are located at One Concourse Parkway, N.E. Suite 600, Atlanta, GA 30328.

3.      Before 4:00 a.m. ET on May 8, 2018 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtors have filed certain motions with this Court, and in the very near future will be filing additional motions that I am advised are customary to file at the beginning of a comparable chapter 11 bankruptcy case and that I believe are necessary to ensure the ongoing operations of the Debtors (the "First Day Pleadings").

4.      As described in further detail below, the Debtors have filed these chapter 11 cases to maximize the value of their assets for the benefit of all their stakeholders. Headquartered in Atlanta, Georgia, the Debtors combine to form what is believed to be the second-largest franchisee operator of Applebee's Neighborhood Grill & Bar restaurants, operating 159 restaurants across 15 geographically diverse states: Alabama, Arizona, Florida, Illinois, Indiana, Kansas, Kentucky, Missouri, Mississippi, Nebraska, Ohio, Oklahoma, Pennsylvania, Texas and Wyoming.  Taken together, the Debtors represent slightly less than 10 percent of all Applebee's locations.

5.      Unfortunately, as discussed herein, significant challenges encountered by the Applebee's brand generally, and specific managerial decisions made on behalf of it by its franchisor, Applebee's International, Inc. (the "Franchisor"), have negatively impacted the Debtors' business operations and left them facing near-term liquidity issues.  To address these liquidity issues, over the past year the Debtors have engaged in considerable efforts to improve their efficiency and reduce their operating expenses with an eye toward a revitalization of their business.  These include, among other things, renegotiating lease terms with landlords, divesting themselves of certain underperforming locations, and initiating various efforts to reduce corporate and back-office overhead expenses, as discussed further below.  In recognition of these

efforts, the Franchisor acknowledged the Debtors were good operators and credited the Debtors

for their efforts at improving performance.[2]  During this time and as part of these efforts, the

Debtors also engaged in negotiations with their Franchisor around a host of issues relating to the

operation of their business.  Leading up the Petition Date, the Debtors believed (based on

feedback from the Franchisor) that these ongoing discussions were progressing in a fruitful

manner.  As of the Petition Date, however, these discussions with the Franchisor had yet to yield

a definitive agreement, and immediately before Petition Date the Franchisor unexpectedly

indicated that it intended to issue a notice of termination of the Debtors' franchise rights relating

to locations in Arizona and Texas.

      6.      To address the Franchisor's unexpected threat and to further address

various operational challenges and maximize the value of their business, the Debtors in

consultation with their professional advisors, after considering all available strategic options,

determined that the best course to maximize the value of the Debtors' estates was to commence

these chapter 11 cases, a decision that enjoys the support of the Debtors' Senior Creditors (as

defined below).

      7.      I have reviewed each of the First Day Pleadings filed thus far (including

the exhibits and other attachments to such pleadings) and it is my belief that the facts set forth in

each are true and correct.  I will also review all subsequent First Day Pleadings to ensure they are

likewise true and correct.  The relief sought in the First Day Pleadings is necessary to the

Debtors' efforts to preserve and maximize the value of their assets for the benefit of the Debtors'

---

[2] Indeed, three of the Debtors' officers and directors – its President, Chief Operating Officer and Chairman – serve on the Franchise People, Operations and Technology Councils, respectively, of the Applebee's Franchise Brand Council ("FBC").  The FBC consists of franchisee representatives and makes appointments to the foregoing respective Councils, demonstrating the respect for the Debtors' personnel among the franchisee community.  This respect has also extended to the Franchisor, who in 2017 awarded the Debtors their "Technology Innovator of the Year" award.

estates.  The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as minimize adverse consequences that might otherwise result from the commencement of such cases.

8.      Part I of this Declaration provides an overview of the Debtors' businesses. Part II provides a description of the Debtors' capital structure.  Part III provides a discussion of the circumstances that prompted the commencement of these chapter 11 cases.  Part IV addresses the Debtors' strategy to maximize the value of their assets.  Part V affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

**Part I**

**Overview of Debtors' Business**

**A.  History of the Debtors**

9.      The Debtors were formed in 2012 with an equity investment from non-Debtor ACON Franchise Holdings, LLC ("AFH") and debt financing led by Bank of America, N.A. (the "Agent" or "Bank of America") with participation interests held by other major banks (collectively with Bank of America, the "Senior Lenders" and together with the Agent, the "Senior Creditors").  The Debtors' business operations were built through a series of acquisitions of existing franchises, including some franchise locations acquired out of bankruptcy,[3] beginning with an acquisition of 45 franchise locations in December 2012.  Thereafter, the Debtors made several other large franchise acquisitions over the course of 2013-2015, including the addition of 15 Chicago-area locations in June 2013, 78 Arizona, Kentucky and Ohio area locations in December 2013, and 33 Indiana and Ohio locations in August 2015 that were financed with

---

[3] Locations were acquired out of *In re: AppleILLINOIS, L.L.C.*, Case No. 13-20723 (TNW), a case in the United States Bankruptcy Court for the Eastern District of Kentucky, Covington Division.

unsecured debt from BMO Harris Bank N.A. ("BMO") guaranteed by an affiliate of AFH.

Additionally, in 2014 the Debtors opened two new franchise locations, both located in Texas.

10.    A copy of the Debtors' organizational chart is attached hereto as Exhibit

A.  As shown on Exhibit A, Debtors (i) RMH Franchise Corporation, (ii) NuLnk, Inc. and (iii)

RMH Illinois, LLC are each 100% owned by Debtor RMH Franchise Holdings, Inc., which is

itself 100% owned by non-Debtor AFH.  The final Debtor, Contex Restaurants, Inc., is 100%

owned by Debtor RMH Franchise Corporation.

**B.  Debtors' Assets and Liabilities**

11.    For the trailing twelve months ending March 31, 2018,[4] the Debtors

generated approximately $375.9 million in gross revenue, and $12.6 million of EBITDA, on a

consolidated basis, a drop of roughly 60% in two years from the Debtors' peak of $431.1 million

and $31.4 million, respectively, in the twelve months ending March 31, 2016.  The Debtors have

cash on hand in excess of $18 million as of the Petition Date, which is subject to a perfected

security interest in favor of the Senior Creditors.

**Part II**

**Capital Structure of the Debtors**

12.    As of the Petition Date, the Debtors have no outstanding funded secured

debt obligations other than those owed to the Senior Creditors, and believe they have no other

secured obligations of any kind other than any potential statutory lien claims of taxing authorities

or vendors arising in the ordinary course of business under applicable state law, and potentially a

---

[4] The financial information herein reflects the unaudited financial information of the Debtors as of March 31, 2018 unless otherwise noted.

single equipment financier whom does not have a lien in the existing cash of the Debtors.[5]  The

significant liabilities of the Debtors are described in more detail below.

**A.  Secured Claims of the Senior Creditors**

      13.    As briefly noted above, the Debtors are obligors under a secured debt

facility provided by the Senior Creditors and administered by the Agent.  More specifically, as of

the Petition Date, Debtors RMH Franchise Holdings, Inc. and RMH Franchise Corporation are

borrowers under that certain *Amended and Restated Credit Agreement* dated as of December 20,

2013 (as amended, modified, restated and/or supplemented, the "Credit Agreement" and together

with all other documents, instruments, and agreements delivered in connection with the Credit

Agreement, as amended modified, restated and/or supplemented, the "Loan Documents") for

which the Agent serves as administrative agent, collateral agent, and l/c issuer.  Debtors Contex

Restaurants, Inc., RMH Illinois, LLC, and NuLnk, Inc. are guarantors of the obligations of the

other Debtors under the Loan Documents, and the Secured Creditors have valid, perfected liens

in substantially all assets of all of the Debtors other than Contex Restaurants, Inc. and NuLnk,

Inc.,[6] including the Debtors' cash collateral.  Additionally, non-Debtor Franchise Holdings also

is a guarantor of the Debtors' obligations under the Loan Documents.

      14.    As of the Petition Date, the Debtors are indebted to the Senior Creditors in

the aggregate principal amount of $68,487,089.71 pursuant to the Loan Documents, plus

additional potential pre-petition interest, fees, expenses, and other amounts arising in respect of

---

[5] US Foods, Inc. has made a filing with the Kansas secretary of state asserting a lien in discrete equipment sold to the Debtors by it and accounts of Debtor RMH Franchise Corporation, but the Debtors are still reviewing this asserted secured claim and its Article 9 filing, and reserve all rights with respect to the same.

[6] Based on the Debtors' search, no UCC financing statement was filed against NuLnk, Inc. with the Delaware secretary of state prior to the Petition Date, nor was any UCC financing statement filed against Contex Restaurants, Inc. with the Texas secretary of state prior to the Petition Date.

such obligations immediately prior to the Petition Date.  As of the Petition Date, the Debtors

were in default of the Credit Agreement and/or other Loan Documents.

**B.  BMO Unsecured Claims**

15.    Also as briefly noted above, in August 2015 Debtors RMH Franchise

Holdings, Inc. and RMH Franchise Corporation financed the acquisition of 33 Indiana and Ohio

franchise locations with unsecured debt from BMO (the "BMO Loan Debt"), pursuant to that

certain *Loan Authorization Agreement* dated August 26, 2016 and related documents

(collectively, the "BMO Loan Documents").  The BMO Loan Debt is guaranteed by an affiliate

of AFH, but is not guaranteed by the other Debtors.  The BMO Loan debt is not secured by any

collateral of the Debtors and, although structurally subordinate to the Senior Creditors as a result,

is also subordinate to the Senior Creditors by virtue of a *Subordination Agreement* dated as of

August 26, 2015.

16.    Interest accruing on the BMO Loan Debt is paid-in-kind, or PIK, interest

that accumulates monthly to the outstanding principal balance at a rate of 4.75% per annum.  As

of the Petition Date, the outstanding balance of the BMO Loan Debt is in excess of $30 million.

**C.  Other Unsecured Obligations**

17.    In the ordinary course of operating their business, the Debtors utilize

goods and services from hundreds, if not thousands, of trade vendors.  Many of these creditors

will be owed a prepetition claim by the Debtors due to the interruption of these chapter 11 cases.

**Part III**

**Events Leading to the Commencement of These Cases**

18.    The Debtors' challenges stem from challenges encountered by the

Franchisor's "Applebee's" brand generally that have negatively impacted their business

operations and seen the brand fall behind comparable bar and grill peers over the last several

01:23183370.9

years in key operating metrics and a number of franchisee failures.  As publicly reported,[7]

Applebee's same-store sales as a whole dropped more than 5 percent in 2016, including a 7.2-

percent decline in the fourth quarter of that year.  Over trailing two years ending with that same

quarter, the chain's same-store sales were down 9.7 percent.

19.    Reflective of these issues, but also further exacerbating them, is the fact

that the Franchisor has had four presidents since the beginning of 2014.  Throughout this period,

different Franchisor-mandated initiatives led franchisees such as the Debtors to incur significant

additional capital expenditures, further straining liquidity.  These initiatives included converting

existing grills to new wood-fired grill platforms in all restaurants and a new ad campaign, neither

of which were received favorably by customers and thus only magnified the strain on the

Debtors.  These difficulties were exacerbated by generally increased food costs, higher minimum

wage rates and other labor costs, and increasing rents.

20.    To better navigate this challenging business environment, improve

liquidity and ensure the continued viability of their franchised locations, over the past year the

Debtors have engaged in considerable efforts to improve their efficiency and reduce their

operating expenses.  Beginning in early 2017, the Debtors began discussions with a consultant

retained by the Franchisor to negotiate restructurings with franchisees.  In July 2017, the Debtors

engaged Hilco Real Estate, LLC to approach the Debtors' landlords in an effort to renegotiate

and amend leases with lower rents, or negotiate lease terminations where appropriate, and

reached agreements on improved terms for a number of locations.  In October 2017, with the

discussions with the Franchisor still not yielding any results, the Debtors retained Mastodon

Ventures Inc. "Mastodon"), a well-known financial advisor that focuses its work on providing

---

[7] *See* Restaurant News, http://www.nrn.com/people/applebee-s-sales-decline-pushes-out-julia-stewart.

strategic advisory services to restaurant companies with enterprise values of $20 million to $400 million.

21.     Following its retention, Mastodon analyzed the Debtors' franchise operations and explored a range of strategic alternatives with the Debtors, including both out-of-court restructuring options and a reorganization or sale in chapter 11.  Thereafter, Mastodon and the Debtors began efforts to restructure the Debtors' operations on an out-of-court basis.  One of the keys to this out-of-court strategy have been continued discussions with the Franchisor around several issues relating to the operations of the Debtors.  These discussions occurred over the course of several months and leading up to the Petition Date the Debtors believed these ongoing discussions were progressing in a fruitful manner that would eventually permit the Franchisor and the Debtors to move forward in a mutually productive arrangement.  On the evening before the Petition Date, however, and despite all indications from the Franchisor of prior progress, the Franchisor unexpectedly informed the Debtors it would purport to terminate certain of the Debtors' franchise rights relating to locations in Arizona and Texas the following day.

**Part IV**

**The Chapter 11 Cases**

22.     As noted above, over the past year the Debtors spent considerable time considering a range of in-court and out-of-court strategic options to revitalize their franchise operations.  Although the Debtors were attempting to effectuate an out-of-court restructuring if possible, the Debtors and their professional advisors determined on the Petition Date that commencing these chapter 11 cases subsequently became the best option for the Debtors to maximize the value of their businesses and estates for the benefit of all of their stakeholders, including vendors, employees, and other creditors.  While doing so prevented a possible undue forfeiture of certain of their assets, the Debtors also intend to use the provisions of chapter 11 to

01:23183370.9

further the restructuring efforts they commenced out-of-court a year ago through additional lease renegotiations and contract negotiations with other key constituents, all as part of a broad-based continuing effort to maximize the value of the Debtors' estates.

## Part V

## Facts Relevant to the First Day Pleadings

23.     To facilitate these chapter 11 cases, the Debtors have filed and will file the First Day Pleadings, requesting various forms of relief.  Generally, the First Day Pleadings are designed to meet the Debtors' goals of:  (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible while the Debtors seek to maximize the value of their estates through these chapter 11 cases; (b) maintaining the confidence and support of their employees and other key constituents during the chapter 11 process; and (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

24.     I have reviewed each of the First Day Pleadings filed to date or contemporaneously herewith, and the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge, information and belief, and are incorporated herein by reference.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

25.     It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs (including the Debtors' existing cash management system), the relief requested is essential to preserve the value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the Debtors and all stakeholders of the Debtors' estates.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will

01:23183370.9

forestall such irreparable harm, thus maximizing the value of the Debtors' estates to the benefit
of all stakeholders.  Further, the Debtors believe that such relief will enable them to stabilize
their operations and avoid a chaotic post-filing period that results in a diminution of estate value.

26.      Without limiting the foregoing, I will note that the Debtors intend to
finance their post-petition operations and these chapter 11 cases through the use of cash
collateral in which the Senior Creditors assert security interests.  The Debtors have an immediate
need for use of cash collateral to support their working capital requirements, make payments to
vendors, employees and other third parties, and to pay other administrative expenses.  Such
financing is critical to preserve the going concern value of the Debtors' estates, and without such
financing the Debtors would suffer immediate and irreparable harm to the value of their business
and estates.

27.      Because the Debtors' funds are encumbered by the liens of the Senior
Creditors, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries
and other operating expenses, including, but not limited to, food orders, rent and utility
obligations.  Due to the nature of the Debtors' operations, which are dependent upon
uninterrupted access to necessary working capital, immediate access to cash collateral is
essential to prevent irreparable harm to the Debtors' estates.  Use of cash collateral is also
necessary to provide assurance to employees, landlords, suppliers and other parties that they will
be paid on a timely basis for post-petition goods and services.  Without immediate access to cash
collateral, the Debtors' day-to-day operations would come to a halt, jeopardizing the Debtors'
prospects of maximizing value, and the Debtors submit that there are no viable financing
alternatives available to them under the circumstances other than the use of cash collateral by the
Senior Creditors.

28.      The terms of the cash collateral usage proposed in these chapter 11 cases has been negotiated in good faith between counsel for the Senior Creditors and the Debtors' professionals, and I believe these terms serve to maximize the value of the Debtors' estates. Accordingly, I specifically note that I believe the Cash Collateral Motion should be approved.

<u>**CONCLUSION**</u>

29.      For all the reasons described herein and in the First Day Pleadings, which are incorporated herein by reference, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

01:23183370.9

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 9, 2018

 _/s/ Mitchell S. Blocher_____
Mitchell S. Blocher

**<u>EXHIBIT A</u>**

