## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RMH Franchise Holdings, Inc., *et al.*[1] | ) | Case No. 18-11092 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Docket Ref. No. 221** |
| | ) | |

## APPLEBEE'S OPPOSITION TO DEBTORS' MOTION TO ESCROW CERTAIN FRANCHISE FEES

Dine Brands Global Inc., the ultimate parent company, along with Applebee's Restaurants LLC and Applebee's Franchisor LLC (collectively, "Applebee's"), files this opposition (the "Opposition") to the *Debtors' Emergency Motion for Entry of an Order, Pursuant to Sections 105(a), 362, and 363 of the Bankruptcy Code: (I) Authorizing the Escrow of Certain Franchise Fees; (II) Approving and Establishing Terms and Conditions Governing Escrow Account; and (III) Prohibiting Franchisors from Seeking to Terminate Franchise Agreements or Exercise Any Other Purported Remedies In Connection Therewith* [Dkt. No. 221] (the "Debtors' Motion to Escrow Franchise Fees").  The Debtors should, rather, continue to pay all outstanding post-petition Franchise Fees[2] (comprised of certain royalties and advertising fees) to Applebee's as those fees come due.  In support of Applebee's Opposition, it states as follows:

## PRELIMINARY STATEMENT

1.    The Debtors' license to use Applebee's trademarks (the "Marks") and right to operate the Applebee's restaurants was governed by individual franchise agreements (the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: RMH Franchise Holdings, Inc. (7150); NuLnk, Inc. (7381); RMH Illinois, LLC (0696); RMH Franchise Corp. (1807); Contex Restaurants, Inc. (0710).  The headquarters for the above-captioned Debtors is located at One Concourse Parkway, N.E., Suite 600, Atlanta, GA 30328.

[2]    Unless otherwise defined, capitalized terms shall have the meaning ascribed to them in the Debtors' Motion to Escrow Franchise Fees.

"Franchise Agreements").   The Franchise Agreements required the Debtors to, among other things, pay certain Franchise Fees to Applebee's as consideration for the use of the Marks.  (*See* Cheong Declaration [Dkt. No. 92], ¶¶ 10-12.)

2.       Post-petition, the Debtors continue to operate the franchises using the Applebee's Marks, have received the benefit of their use of the Applebee's Marks and have benefited from the nationwide marketing done by Applebee's post-petition.

3.       Despite this benefit to these estates which entitle Applebee's to allowance of an administrative expense claim, the Debtors now propose to "deposit into a segregated escrow account the amounts set forth in the Budget (as defined below) under the line item 'Royalty and Advertising Fund' which relate to the approximate amount of Franchise Fees rather than to turnover such budgeted Franchise Fees" to Applebee's pending the resolution of the Adversary Proceeding.  (*See* Debtors' Motion to Escrow Franchise Fees, at 1-2 [Dkt. No. 221]).

4.       The Adversary Proceeding, however, does not provide a basis to withhold the Franchise Fees owed to Applebee's.  The Debtors cannot have it both ways; they cannot continue to use the Marks based on their theory that the Franchise Agreements are property of these estates and reap the benefits therefrom, but then not pay the Franchise Fees due under the Franchise Agreements.  The Debtors state that they "believe it is both prudent and equitable that the budgeted Franchise Fees be placed into the Escrow Account" purportedly since (i) it is uncertain whether payment is being sought related to Franchise Fees under the Franchise Agreements or as an administrative claim in the event that the purported termination was effective, and (ii) Applebee's actions have caused, and continue to case, substantial damage to the Debtors' business and threaten the success of these chapter 11 cases. (*See* Debtors' Motion to

107632417/V-4DOCS_DE:220008.1 18037/001

Escrow Franchise Fees, pp. 5-6 [Dkt. No. 221]).[3]  However, whether the Debtors are using the Marks and benefiting from both the use of Mark and the national advertising because the Franchise Agreements were not terminated (their argument) or because they simply want to continue to benefit from the use of the Mark and the national advertising pending a decision on the status of the Franchise Agreements (Applebee's argument), the Debtors have to pay the post-petition Franchise Fees as an administrative expense.  Thus, the administrative expenses based on the Debtors' post-petition use of the Marks must be paid to Applebee's regardless of whether the Court agrees that the Franchise Agreements were terminated pre-petition.  Moreover, because of the risk of administrative insolvency, the Debtors should continue to pay Applebee's all outstanding post-petition Franchise Fees as they come due, as described below.

## **RELEVANT FACTS**

5.      The advertising fees, like the royalty fees, were based on each calendar month's gross sales.  (*See* Cheong Declaration [Dkt. No. 92], ¶ 12.)  These fees were paid into a fund that is used to pay for system-wide advertising.  *Id.*  An Applebee's franchisee's failure to pay into

---

[3]    The Debtors' alleged claims against Applebee's are not grounds for non-payment of the Franchise Fees and continuing use of the Marks.  *See Red Roof Franchising, LLC v. Patel*, 564 Fed. Appx. 685, 688 n. 4 (3rd Cir. 2014) (stating that "where a franchisee alleges breach of contract by a franchisor . . . the franchisee may not . . . withhold royalties and continue to operate as usual."); *California Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 Fed. Appx. 340, 348 (3rd Cir. Mar. 11, 2010) (rejecting a franchisee's argument that the franchisor's alleged breach of contract barred specific performance); *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806-07 (3rd Cir. 1998) (holding that a franchisee's claim that the franchisor breached the franchise agreement went to the issue of determining damages and not whether performance is excused); *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3rd Cir. 1992) ("a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor."); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308-09 (11th Cir. 1998) (holding that "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor. The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated"); *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, No. 2:10-2751, 2011 WL 4594910, at *1-2 (C.D. Cal. Feb. 23, 2011) ("The validity of a franchisor's termination depends on whether the franchisee breached the franchise agreement, and a franchisor's breach does not excuse a franchisee's breach."); *Knights Franchise Sys., Inc. v. P.C.P.S. Corp.*, No. 06-5243, 2009 WL 3526229, at *3-4 (D.N.J. Oct. 21, 2009) (holding that a franchisee is not excused from paying franchise fees based on a claim the franchisor breached the franchise agreement); *Burger King Corp. v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) ("[A] terminated franchisee's remedy for [alleged] wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks.").

DOCS_DE:220008.1 18037/001

the advertising fund results in a decrease in total national advertising funds available to Applebee's franchisees and, thereby, causes harm to Applebee's and all of Applebee's franchisees.  *Id*. at ¶ 13.

6.      Beginning in June 2017, the Debtors stopped paying royalties due under the Franchise Agreements.  (*See* Cheong Declaration [Dkt. No. 92], ¶ 22.)

7.      In January 2018, the Debtors stopped paying advertising and other fees due under the Franchise Agreements on a majority of the franchises and, eventually, stopped paying on all of them.  (*See* Cheong Declaration [Dkt. No. 92], ¶ 23.)

8.      Despite their non-payment of royalties and advertising and other fees, the Debtors continued to operate the franchises using the Applebee's Marks.  (*See* Cheong Declaration [Dkt. No. 92], ¶ 24.)

9.      Through April 2018, the Debtors owe Applebee's at least $12,161,823 in unpaid royalties and fees with regard to all franchises and there are payment defaults as to each Franchise Agreement.  (*See* Cheong Declaration [Dkt. No. 92], ¶ 34.)

10.      As discussed in *Applebee's Motion to Modify the Automatic Stay* [Dkt. No. 91] and the Adversary Proceeding, the time for the Debtors to cure their monetary defaults under the Franchise Agreements expired on April 26, 2018, and no extended or new cure period was granted.  As a result, the Franchise Agreements for the Debtors' restaurants terminated on April 27, 2018.  As of April 27, 2018, the Debtors had no right or authorization, under the Franchise Agreements or otherwise, to continue to operate the Applebee's restaurants and use Applebee's Marks and trade name.  Nevertheless, the Debtors continue to operate Applebee's restaurants and use Applebee's Marks to this day.  As of the filing of this Opposition, the Debtors are current in

DOCS_DE:220008.1 18037/001

paying their post-petition Franchise Fees, but they have asked the Court to excuse future payment by allowing them to escrow the payments otherwise due to Applebee's.

11.     These administrative expenses based on the Debtors' post-petition use of the Marks must be paid to Applebee's regardless of whether the Court agrees that the Franchise Agreements were terminated pre-petition.  Thus, it does not make sense to escrow the franchise fees and royalties incurred by the Debtors post-petition until the Court determines whether the Franchise Agreements were terminated.  Instead, the Debtors should continue to immediately pay Applebee's all post-petition franchise fees and royalties as they come due.

## I.     Applebee's Is Entitled to Allowance of an Administrative Expense Pursuant to Section 503(b)

12.     Section 503(b) of the Bankruptcy Code provides, in pertinent part, that "there shall be allowed[] administrative expenses, . . . including the actual, necessary costs and expenses of preserving the estate. . . ."  11 U.S.C. § 503(b)(1)(A).  In the Third Circuit, as elsewhere, the actual, necessary costs and expenses of preserving the estate include claims "aris[ing] from a transaction with the debtor-in-possession" where "the consideration supporting the claimant's right to payment [is] beneficial to the debtor-in-possession in the operation of the business."  *In re Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999).  The claimant under section 503(b)(1)(A) bears the burden of establishing the requisite transaction with the estate and benefit to the estate by a preponderance of the evidence.  *See In re ID Liquidation One, LLC*, 503 B.R. 392, 399 (Bankr. D. Del. 2013).

13.     A debtor's acceptance of a non-debtor party's post-petition performance under an executory contract satisfies the transaction-with-the-estate requirement for administrative expense priority.  *See id.* (noting "[c]ourts in this district have consistently held that

administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending assumption or rejection," and citing cases).

14.     The benefit to the estate is measured by the "reasonable value of the services" provided by the non-debtor.  *See id.* (internal quotation marks, citation omitted).  Where services are provided pursuant to a contract, "there is a presumption that the contract terms and rate represent the reasonable value of the services . . . provided under the contract."  *Id.*; *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010).  To rebut this presumption, the debtor must provide "convincing evidence to the contrary"—not mere legal argument.  *Smurfit-Stone*, 425 B.R. at 741 (internal quotation marks, citation omitted).

15.     *Smurfit-Stone* is instructive.  In that case, the debtors' predecessor in interest had contracted with a municipality for the construction of a utility plant adjoining one of its factories. The construction was financed with municipal bonds, and the parties entered into a utility operating agreement that required the factory owner to pay for the costs of operating and maintaining the utility plant, and to make debt service payments on the bonds.  During their chapter 11 case, the debtors continued to use the utility plant and pay the operating and maintenance costs for the utility plan, but they failed to make any bond payments.  The indenture trustee for the bonds moved to compel the bond payments under section 503(b), which the debtors opposed by raising a variety of legal arguments, but without denying that they had been utilizing the utility plant and without providing any evidence that the utility operating agreement was unreasonable.  Judge Shannon overruled the objection, finding "the Debtors can[not] simply excise portions of the payment due under the Utility Contract."  *Smurfit-Stone*, 425 B.R. at 742. To the contrary, Judge Shannon found that the "*Manufacturer negotiated for its entire package*

*of compensation ($50,000), and Customer must rebut the presumption that the contract rate is the reasonable value of the services provided.*" *Id.* (emphasis added).

16.     As with the utility plant in *Smurfit-Stone*, it cannot be denied that the Debtors have received the benefit of their use of the Applebee's Marks and benefited from the nationwide marketing done by Applebee's post-petition.   Nor can it be denied that Applebee's, in negotiating the fully integrated Franchise Agreements prepetition, specifically bargained for "all in" pricing for the use of the Marks and advertising.   Under these circumstances, Applebee's is clearly entitled to allowance of an administrative expense request for the services provided post-petition under the Franchise Agreements at the full contract rate for such services, including the advertising fees and royalties.  *See In re Shreyas Hosp., LLC*, No. 09-70523, 2010 WL 2836751, at *1 (Bankr. C.D. Ill. July 15, 2010) (allowed administrative claim for debtor's use of trademarks post-petition); *In re Home Interiors & Gifts, Inc*., No. 08-31961-11-BJH, 2008 WL 4772102 (Bankr. N.D. Tex. Oct 9, 2008) (same); *In re Beverage Canners Int'l Corp*., 255 B.R. 89 (Bankr. S.D. Fla. 2000) (same); *In re B-K of Kansas, Inc*., 82 B.R. 135 (Bankr. D. Kan. 1988), aff'd, 99 B.R. 446 (D. Kan. 1989) (same).

17.     Additionally, if the Court finds the Franchise Agreements were terminated pre-petition, each day the Debtors continue to use the Applebee's Marks post-petition, the Debtors will continue to accrue trademark infringement damages as post-petition administrative expense claims.  Also, because the Franchise Agreements have been terminated, the Debtors' ongoing trademark infringement is considered willful, entitling Applebee's to treble damages in calculation of its administrative claim.  15 U.S.C. § 1117(b); *Days Inns Worldwide, Inc. v. Mayu & Roshan, LLC*, No. 06-1581, 2007 WL 1674485, at *7-8 (D.N.J. June 8, 2007) (imposing treble

7

damages on holdover franchisee for willful trademark infringement); *see also State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc*., 425 F.3d 708, 772 (9th Cir. 2005).

18.     Debtors' citation to *Krystal Cadillac Oldsmobile GMC Truck, Inc. v. General Motors Corp. (In re Krystal Cadillac Oldsmobile GMC Truck, Inc.)* ("*Krystal*"), 142 F.3d 631 (3d Cir. 1998) is unhelpful.  In *Krystal*, the Third Circuit Court of Appeals held that the franchise agreement was an asset of the bankruptcy estate because it had not been terminated effectively prepetition.  *Id.* at 636.  Here, however, as set forth in the Adversary Proceeding, the Franchise Agreements were terminated prepetition and there was no statute that tolled the termination.  But, most importantly, the Third Circuit did not offer any opinion on the issue raised here: can the Debtors use the Franchise Agreements post-petition and not pay for the reasonable value of that use.

## II.     The Court Should Order The Debtors To Continue To Pay Applebee's Administrative Expense Claim As It Comes Due

19.     Section 105(a) provides that the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The Court's power under section 105(a) includes discretion to order immediate payment of an administrative expense claim.  *See In re Global Home Prods. LLC*, No. 06-10340(KG), 2006 WL 3791955, *4 (Dec. 21, 2006); *In re Garden Ridge Corp*., 323 B.R. 136 (Bankr. D. Del. 2005) (Bankruptcy court has discretion in determining when an administrative expense will be paid.).  In evaluating whether to exercise this discretion, the Court should consider the following: (i) prejudice to the debtors, (ii) hardship to the claimant, and (iii) potential detriment to other creditors.  *Global Home Prods*., 2006 WL 3791955, *4; *Garden Ridge*, 323 B.R. at 143.  Each of these factors militates in favor of immediate payment here.

20.     First, there is no prejudice to the Debtors because they have procured consensual cash collateral usage for the express purpose of "maintain[ing] their operations" in these chapter 11 cases and "pay[ing] their administrative expenses."  *Debtor's Motion For Interim And*

*Final Orders (A) Authorizing Postpetition Use Of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(b), And Granting Related Relief*, [Dkt. No. 23, ¶ 10].  Moreover, the Debtors have argued that the use of cash collateral to timely pay their administrative expenses is essential to maintaining the value of the assets of the estates.  *Id*., ¶ 23 (The Debtors' use of cash to "operat[e] their business and satisfy other working capital needs during these chapter 11 cases . . . is vital to the preservation and maintenance of the value of the Debtors' estates and the successful prosecution of these chapter 11 cases.").  This is as it should be, since, if the Debtors are going to avail themselves of the benefits of the chapter 11 process, they must have the wherewithal to bear the associated expenses.  *See* 11 U.S.C. § 1112(b)(4)(A) (defining "cause" for dismissal or conversion of a chapter 11 case to include "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation").

21.    Second, the Debtors continued failure to pay will cause substantial hardship to Applebee's because, as noted above, the amounts due are substantial and the Debtors are Applebee's second largest single franchisee.  *Cf. Global Home*, 2006 WL 3791955 at *4-5 (finding no hardship to claimant where it had other sources of revenue).

22.    In particular, the Debtors failure to pay its share of the national advertising fees is a significant detriment to Applebee's.  The monies owed by the Debtors to the advertising fund represented almost 10% of the total amounts available for such advertising.  Applebee's spends millions of dollars annually on nationwide TV advertising as well as social media and digital ads.  Although specifics are highly competitive information, Applebee's can say here that there are regular national TV ads, for example, promoting the Applebee's brand and encouraging dining at Applebee's nationwide.  The Debtors benefit from this advertising.  Conversely, the harm to Applebee's is significant.  It has to budget annually for the media buy and commit to it in advance.  When there is a shortage in the advertising fund, Applebee's must either renege on its "buy," which would raise the cost of media going forward, or the ad fund needs to obtain a loan, or the ad fund needs to draw against the media budgets from future quarters (meaning they are

9

literally robbing from the brand's future).  In the meantime, the Debtors participate without contributing in all of Applebee's promotional offers and current national campaigns.

23.    The Debtors failure to timely make royalty payments also harms Applebee's because the royalties are designed to, among other things, fund Applebee's ability to prosecute and protect its various Marks (the heart of the brand), allow Applebee's to pay its employee and administrative costs and develop new products.  Without these items, the Applebee's franchise system would fail.

24.    Third, there will be no prejudice to other creditors because (i) to the extent their claims are administrative in nature, the Debtors have procured cash collateral usage to cover those claims and (ii) to the extent their claims are unsecured, non-priority claims, they are subordinate to Applebee's administrative expense claims in any event.  Accordingly, to prevent further hardship to Applebee's —and to avoid Applebee's becoming a *de facto* financier of the Debtors' chapter 11 proceedings—the Court should exercise its discretion to compel payment of amounts due post-petition under the Franchise Agreements as they come due.

## III.    Applebee's Is Entitled To Adequate Protection

25.    Further, Applebee's is entitled to prompt payment of the post-petition franchise fees as adequate protection of their interests in the Franchise Agreements.  Adequate protection may be provided "on request of an entity that has an interest in property used … or proposed to be used … with or without a hearing, shall … condition such use … as is necessary to provide adequate protection of such interest …." 11 U.S.C. § 363(e).

26.    Adequate protection should consist of timely cash payments for the post-petition use of the Marks and the benefit conferred on the Debtors by the national marketing provided by Applebee's.  *See* 11 U.S.C. § 361; *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 794 (Bankr. D. Del. 2002).  Simply allowing an administrative expense claim for the franchise fees and advertising fees may not adequately protect Applebee's, especially where there is a potential for administrative insolvency.  *See* 11 U.S.C. § 361(3) (making it clear that adequate protection may

not take the form of a deferred administrative claim).  The decision of the bankruptcy court in *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 385 (Bankr. W.D. Pa. 1985) is instructive.  In that case, the court held that a lessor of computer equipment was not entitled to adequate protection.  However, that case is clearly distinguishable from the Debtors' cases.  In that case, the lessor had received all regular monthly payments post-petition and the debtor had otherwise complied with its contractual obligations.  The court thus reasoned that the lessor was "receiving precisely what it bargained for under the terms of the Lease Agreement."  *Id*. at 389.  Conversely, here, the Debtors will only receive what it bargained for under the terms of the Franchise Agreement, as they inform the reasonable value of the benefit conferred on the Debtors if the Debtors continue to make any post-petition payments due under the Franchise Agreements as they come due.

## RESERVATION OF RIGHTS

27.     Applebee's reserves the right to amend, modify, or supplement this opposition and to assert any additional administrative expense claims prior to any administrative bar date.

28.     Applebee's also reserves the right to assert any other monetary claims against the Debtors which arose pre-petition.

WHEREFORE, Applebee's respectfully requests that the Court (i) deny the Debtor's Motion to Escrow Franchise Fees, and (ii) enter an order compelling the Debtors' to pay Applebee's all outstanding post-petition franchise fees as they come due.

Dated: June 20, 2018                          PACHULSKI STANG ZIEHL & JONES LLP


                                              _/s/ Laura Davis Jones_____
                                              Laura Davis Jones (DE Bar No. 2436)
                                              Timothy P. Cairns (DE Bar No. 4228)
                                              919 N. Market Street, 17th Floor
                                              P.O. Box 8705
                                              Wilmington, DE 19899-8705 (Courier 19801)
                                              Telephone: (302) 652-4100
                                              Facsimile: (302) 652-4400
                                              Email: ljones@pszjlaw.com
                                                        tcairns@pszjlaw.com

                                              -and-

                                              DENTONS US LLP
                                              Samuel Maizel (*Admitted Pro Hac Vice*)
                                              601 S. Figueroa Street
                                              Suite 2500
                                              Los Angeles, California
                                              Telephone: 213-623-9300
                                              Facsimile: 213-623-9924
                                              E-mail: joel.siegel@dentons.com
                                                        samuel.maizel@dentons.com

                                              -and-

DENTONS US LLP
Robert Richards (*Admitted Pro Hac Vice*)
Geoffrey Miller (*Admitted Pro Hac Vice*)
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone:  312-876-8000
Facsimile:  312-876-7934
E-mail:  robert.richards@dentons.com
         geoffrey.miller@dentons.com

*Counsel to Dine Brands Global Inc., Applebee's
Restaurants LLC and Applebee's Franchisor
LLC*